UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| INDEPENDENCE BANK,<br><br>        Plaintiff<br><br>v.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION,<br>550 17th Street, N.W.<br>Washington, D.C. 20429,<br><br>RHODE ISLAND DEPARTMENT OF BUSINESS REGULATION,<br><br>        Defendants | C.A. No. _____ |

## COMPLAINT

### PRELIMINARY STATEMENT

This is a case about blatant federal and regulatory agency overreach. Plaintiff, Independence Bank ("Independence", "Bank" or "Plaintiff"), brings this action against Defendants, Federal Deposit Insurance Corporation ("FDIC") and Rhode Island Department of Business Regulation ("RIDBR"), because Plaintiff has been unable, is still, and will continue to be unable to overcome a Kafka-esque nightmare of the FDIC's design: it is requiring Independence to operate — despite the Bank's stated intention to wind down its operations, surrender its banking charter and terminate its deposit insurance — for an indefinite, potentially infinite period of time until the FDIC in its apparently unfettered discretion determines that the Bank may cease operating. The FDIC insists that forcing Independence to continue operating — despite the Bank performing no lending, no underwriting, holding no loans, and essentially only maintaining a rapidly dwindling deposit base — is required by law. This is incorrect, and

unsurprising, given that the FDIC cannot articulate or identify where this law or rule exists. Such a "rule" is well beyond the FDIC's power, is contrary to its own written guidance, and if it existed at all would give the FDIC unlimited discretion to require institutions no longer engaged in the business of banking to remain open solely for the purpose of being subjected to regulatory scrutiny and fines, indeed even for the "offense" of continuing to operate without performing any lending.

The Bank has consistently and repeatedly been subject to harsh and unfair treatment by the FDIC, for reasons unknown. As but one example, there is the *Catch-22* of the FDIC's approach to the Bank's three-year strategic plan (the "Strategic Plan"). The FDIC has serially objected to any proposed strategic plans submitted by the Bank, while asserting that the Bank's *lack* of an approved strategic plan itself constitutes a violation of either a Consent Order entered in 2019, or, due to the Bank's inability to lend without approval of a strategic plan, of the Community Reinvestment Act. Such "violations" then subject the Bank to penalties. To add further insult to injury, the FDIC then points to the potential for such penalties as a reason why the Bank must continue operating.

As another example, the Bank's deposit base has decreased drastically from its former size (from $46M to $6M) over the last two years, but the FDIC has instructed the Bank that it cannot notify its remaining depositors of its intent to cease banking operations in the future, even as they simultaneously maintain that the existence of those remaining deposits requires the Bank to continue operating.

A third example relates to capitalization. The FDIC has confirmed that the Bank is well-capitalized. The sale of the Bank's existing loan portfolio has put the Bank in the position of holding significant cash, rather than a portfolio of loans, reducing any associated risk to its capital. Nonetheless, any request for shareholder dividends pursuant to the consent order has been denied.

Further, standard requests by the Bank that require FDIC non-objection have been consistently met with objection or no response at all.

Yet another example of the FDIC's ongoing unfair and unreasonable treatment of the Bank comes from the FDIC's recent decision that certain fees charged by the Bank to SBA loan borrowers were improper and constitute unfair and deceptive practices, despite such fees being standard among all SBA lenders and in conformance with the SBA's rules ("SOP"). This is best demonstrated by the fact that during the period when the Bank was acting only with undelegated authority as an SBA lender, the SBA itself approved the very same fees it loans that it underwrote. The SBA's SOP govern which fees are properly charged in connection with an SBA loan and the SBA can require lenders to return fees it deems improper. Here, it did not do so. Yet the FDIC has decided that the relevant agency's own interpretation of its own regulations is wrong. To the Bank's knowledge, *no other financial institution* has been subject to or been found to have violated this new and unique interpretation of the SBA's SOP.

Despite these examples — out of many — of the FDIC treating Independence differently than it would another institution, the FDIC's procedures provide no recourse to the Bank. The agency's internal administrative appeal process, in addition to being subject to active Constitutional challenges,[1] does not even allow for an appeal of the FDIC's bald assertion that a vague, uncited and unwritten "rule" exists which governs a financial institution's ability to terminate its deposit insurance and cease banking operations. The FDIC's position is that the Bank must continue to operate until an unidentified and constantly-shifting checklist of FDIC requirements is satisfied at some uncertain future date. This, on its face, offends due process.

The Bank is very well capitalized. It intends to — and is fully able to — pay out

---

[1] See *Axon Enterprise, Inc. v. Federal Trade Commission et al.*, and *Securities and Exchange Commission, et al. v. Michelle Cochran*, 598 U.S. 175 (2023).

its depositors in full as part of its liquidation. At present, however, the Bank's depositors are being disadvantaged and denied the benefit of the Bank's ability and determination to pay them in full. The FDIC has commanded the Bank not to disclose to its depositors any intention to close. This harms not just the Bank, but its loyal customers, who upon withdrawal of their funds from the Bank would have the ability to redeposit such funds with another insured financial institution at today's very favorable interest rates if they were informed of the Bank's intent to close its doors.

The FDIC's refusal to allow the Bank to wind-down its operations remains a mystery, but repeatedly forcing the Bank into *Catch-22* situations (such as requiring it to have an approved Strategic Plan but rejecting all such plans, or refusing to allow new lending and punishing the Bank for not lending) indicates strongly that the FDIC's treatment of the Bank arises from an inappropriate vendetta — in short, a desire to financially harm the Bank so as to prevent its shareholders from realizing any value from their equity. Such equity, of course, decreases with each month that the FDIC requires the Bank to continue operating with no source of income and no prospects of future income. Nonetheless, the FDIC is requiring the Bank to continue to operate indefinitely, despite the Bank's repeatedly stated intent to close. If it does so for long enough, the FDIC can ensure that the entirety of the Bank's shareholder value is squandered before any wind-down effort can even begin. This appears be the FDIC's goal.

The Bank has incurred approximately $3.6 million in operating expenses since first raising voluntary liquidation with FDIC and RIDBR. It expects that by 2025 it will have spent another $4 million ***after*** notifying FDIC of its plan to terminate operations and submitting a formal plan of liquidation to RIDBR, essentially just "keeping the lights on" for no apparent purpose other than the FDIC's apparent desire to see the Bank bled dry of equity. The FDIC's position is unlawful, far outside the agency's statutory authority, arbitrary and capricious, in direct

4

contravention of the agency's own regulations, and unlawfully deprives Plaintiff of its liberty interests without due process of law.

Plaintiff, thus by this action, seeks declaratory relief requiring the FDIC and the RIDBR to follow their respective regulations concerning the termination of deposit insurance, voluntary liquidation, and surrender of the Bank's state charter, and allow the Bank to wind-down its operations in compliance with federal and state law.

## PARTIES

1. Plaintiff, Independence Bank, is a corporation organized and doing business under the laws of Rhode Island with its principal place of business at 1370 South County Trail, East Greenwich, Rhode Island.

2. At all relevant times, the Bank was and is an insured State nonmember bank subject to 12 U.S.C. §§ 1811-1831aa, 12 C.F.R. chapter III, and the laws of the State of Rhode Island.

3. Upon information and belief, Defendant, Federal Deposit Insurance Corporation, is a duly organized and existing regulatory agency charged with, among other things, depositor insurance relative to financial institutions and regulating, examining, and ensuring compliance with regard to both federal and state-chartered banking entities. The FDIC's principal place of business is in Washington, D.C. At all relevant times, the FDIC, by and through its Boston, Massachusetts Regional Office, acted as the primary regulator for Independence.

4. Defendant, Rhode Island Department of Business Regulation is a duly organized and existing state regulatory agency charged with, among other things, providing regulatory oversight of state-chartered financial institutions, credit unions and licensees through financial examinations and reviews to determine compliance with state banking laws, financial

solvency and safety and soundness operations. The RIDBR's principal place of business is in Cranston, Rhode Island.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-22, and this Court's inherent equitable powers.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because substantially all of the events giving rise to this claim occurred in this District.

## INTRODUCTION

### Background

7. Plaintiff, Independence Bank is a state-chartered, FDIC-insured banking institution that previously had as its primary focus, over more than twenty years, the origination of Small Business Administration ("SBA") loans under various SBA lending programs. In and before 2019, the majority of the Bank's SBA lending customers came to the bank via referrals from several third parties the Bank contracted with to refer potential loan customers.

8. Under the Federal Deposit Insurance Act, the FDIC regulates the activities of both "insured depository institution[s]," which are banks and savings associations with deposits insured by the FDIC, and "institution-affiliated part[ies]," which include the directors, officers, employees, and controlling shareholders of the insured depository institutions. 12 U.S.C. § 1813(c)(2), (u)(1). The FDIC's responsibilities include supervising and examining covered institutions to ensure financial stability and soundness. *See id*. §§ 1816-1818, 1222.

9. 12 U.S.C. § 1818(p) provides for the automatic termination of deposit insurance "whenever the Board of Directors shall determine that an insured depository institution

is not engaged in the business of receiving deposits," at which time "the [FDIC] shall notify the depository institution that its insured status will terminate at the expiration of the first full assessment period following such notice." The statute further provides that "[a] finding by the Board of Directors that a depository institution is not engaged in the business of receiving deposits, other than such trust funds, shall be conclusive." After termination of insured status under 12 U.S.C. § 1818(p), "the depository institution shall thereafter be relieved of all future obligations to the Corporation, including the obligation to pay future assessments."

10. If Independence were a federally-chartered banking institution, the Comptroller's Licensing Manual[2] provides clear guidance from the Office of the Comptroller of the Currency ("OCC") for the voluntary termination of a federal charter and associated liquidation process. Independence is a state-chartered bank and has no federal charter. However, as the Comptroller's Licensing Manual clearly states, with respect to federally chartered banks, *timely* and *prompt* action to terminate banking operations is called for when a financial institution liquidates:

> [t]he decision to terminate a bank's status as a [ ] bank is generally a business decision made by the bank's board of directors and shareholders or members. If a bank decides to terminate, the **bank should complete the process in a timely manner** and **promptly end its status** as a federally chartered bank. The OCC strongly discourages a bank from selling or transferring substantially all of its assets and liabilities, thereby creating a dormant bank.

Comptroller's Licensing Manual, p. 2 (emphasis added).

11. Here, however, the FDIC has insisted on the opposite of "timely" and "prompt" action, and in doing so leaves Independence in limbo, essentially *requiring* the very "dormant bank" scenario that the OCC manual warns against. Despite having complete knowledge

---

[2] https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-licensing-manual/files/termination-of-federal-charter.pdf. Last visited September 19, 2023.

for more than a year (as of the filing date of this Complaint) that Independence *intends* to cease banking operations, the FDIC has repeatedly told Independence that it cannot do so until and unless some unspecified future point when FDIC might decide to allow such termination. The FDIC has gone so far in this regard as to tell Independence that it cannot even see the forms and documentation that the FDIC will require Independence to submit in connection with termination of insurance, when and if that unspecified future approval ever occurs.

12. The Comptroller's Licensing Manual also provides clear guidance with respect to federally chartered banks that seek to voluntarily liquidate. The process described therein is straightforward:

> Voluntary liquidation is the process by which a solvent bank that has decided to close, without being sold to another owner or merged with another entity, winds down its operations and ceases to exist. The details of a liquidation vary depending on the circumstances, but generally include approval of the plan of liquidation by the bank's board and shareholders or members; non-objection to the plan of liquidation by the OCC; transfer, sale, or liquidation of the bank's assets; transfer, sale, or payment of any deposits and liabilities, including contingent liabilities; and a final distribution of the remaining capital to the shareholders or members.
>
> The OCC generally objects to a liquidation plan if the bank is unable to pay all depositors in full (or to have another insured depository institution assume deposits), or if the bank is unable to pay, or otherwise satisfy, all other creditors and contingent liabilities. If a bank cannot successfully complete a voluntary liquidation on a solvent basis, it may be necessary for the OCC to appoint a receiver for the bank.

Comptroller's Licensing Manual, p. 9.

13. Here, the FDIC has treated Independence differently than it would another financial institution. It has informed Independence that, despite its solvency, despite the Bank's oft-stated intent to dissolve, despite the Bank's submission of a liquidation plan for approval by the RIDBR, and despite the Bank's willingness to set significant portions of its cash reserves in an

escrowed account to satisfy any potential fines or penalties going forward, the Bank may not even begin the wind-down process until the FDIC determines that it has "satisfactorily resolved" all "outstanding regulatory matters." In March 2023, the FDIC reiterated their previously-stated position in a letter to the Bank that "[a]s a reminder …the process for voluntary termination of federal deposit insurance cannot commence … until all outstanding regulatory matters have been satisfactorily resolved" and that "target completion dates identified within the Strategic Plan are not feasible pending commencement of the process for voluntary termination of federal deposit insurance."

### The 2019 Consent Order

14. The FDIC further asserts that such outstanding matters include the existence of a 2019 consent order with the FDIC (the "Consent Order"). Independence has no ability to unilaterally terminate the Consent Order. Thus, unless the FDIC agrees to terminate the Consent Order, the Bank can *never* resolve all outstanding regulatory matters. This is the FDIC's position: that the Bank must operate indefinitely unless and until the FDIC says otherwise.

15. It is undisputed that Independence is solvent, able to pay all depositors in full without any impact whatsoever on the federal deposit insurance fund, and able to set aside sufficient funds to satisfy any remaining contingent liabilities. It stands ready and willing to proceed with the liquidation plan already submitted to its state regulator, the RIDBR. The only obstacle to proceeding with this process is the FDIC's insistence — untethered to statute or regulation — that the Bank cannot even begin this process until, at some unknown future time, the FDIC deigns to allow it. This *ad hoc* and individualized rulemaking is at best arbitrary and capricious, if not intentionally harmful to an FDIC-insured institution, and well outside the authority granted in the Federal Deposit Insurance Act.

16. On or about July 25, 2019, the FDIC, the Rhode Island Department of Business Regulation Division of Banking, and Independence entered into a consent order (the "2019 Consent Order") in an enforcement action identified as *In the Matter of Independence Bank*, FDIC No. FDIC-19-00916/DBR No. 19BK012.

17. Currently, according to the FDIC, there are three unresolved 2019 Consent Order requirements: (a) Management; (b) Board Oversight; and (c) Strategic Plan. The first two, regarding Management and Board Oversight, cannot be resolved by their own terms until an approved revised Strategic Plan is in place. But an approved Strategic Plan revision is not in place, because no such revised plan has received FDIC non-objection.

18. The Consent Order requires that the Bank "develop and submit for review … revisions to its written three-year strategic plan ("Strategic Plan")" concerning:

- "a maximum concentration of unguaranteed SBA SLA loan as a percentage of total capital that can be managed satisfactorily given the bank's [sic] risk management framework and management team"

- "minimum capital ratios that are commensurate with the Bank's business model and risk profile and that are supported by sufficient stress scenarios in light of the loan growth, concentration risk, and credit risk within the Bank's loan portfolio"

- "identification of risks to the Bank flowing from its heavy reliance on the SBA SLA loan program, such as external disruptions to the SBA SLA program, the Bank's loss of its SBA preferred lending status, or the loss of any independent sales organization ("ISO") and the development of contingency plan for mitigating those risks" and

- "pro forma balance sheet and income statements for each of the three years covered the plan consistent with the Strategic Plan."

2019 Consent Order, ¶ 3(a).

19. The first three Strategic Plan revision requirements concern specifics of the Bank's *lending* programs, specifically the SBA SLA program. The Bank has not issued loans under that program since 2019, and none of its Strategic Plan submissions have proposed any further involvement of the Bank with that program. The final requirement, for *pro forma* balance sheets and income statements to be included in the Strategic Plan, has been complied with in every Strategic Plan submitted.

20. The 2019 Consent Order also required in ¶ 10(a) that "the Board [of the Bank] shall notify and obtain non-objection from the Deputy Regional Director and Superintendent of Banking before engaging in any transactions that would materially change the Bank's risk profile or balance sheet composition."

21. The Bank was granted non-objection by the FDIC to sell its entire loan portfolio to a third party in August 2022 in preparation for its anticipated voluntary liquidation by the end of that calendar year.

22. Maintaining and servicing that loan portfolio had contributed the vast majority of the Bank's earnings prior to the portfolio sale. Despite knowing this, the FDIC has refused since the portfolio sale to allow the Bank to proceed with its voluntary liquidation and has further refused all efforts on the Bank's part to revise its Strategic Plan to reflect the portfolio sale and planned liquidation. The Bank has thus been starved of any further income from lending or servicing, even while being prohibited from completing the intended liquidation.

**Multiple Requests for Non-Objection to Independence Bank's
New Strategic Plans Are Denied by FDIC**

23. Since entering the 2019 Consent Order, the Bank has submitted at least five (5) revisions to its Strategic Plan to the FDIC. Each subsequent submission has been revised to reflect and address all regulatory recommendations from the FDIC examiners and all comments

from each prior FDIC visitation. Each such revision thus requires additional information, information which in each instance was not required of the Bank in prior submissions. Nonetheless, each such request was met with the requested information by the Bank. And each time, the FDIC nonetheless objected to the Strategic Plan revisions.

24. Since 2019, the FDIC has objected to *every* strategic plan revision submitted by the Bank. The FDIC then points to the Bank's failure to have an approved revised Strategic Plan as required by the 2019 Consent Order as a basis for continuing the pendency of the 2019 Consent Order.

25. As an example, after the SBA recommended that the Bank engage in direct lending under a working capital commercial loan program recommended by the SBA. The Bank then submitted a Strategic Plan to the FDIC on or about August 7, 2021 that proposed a Direct Working Capital Small Loan program. The FDIC rejected this proposed plan, saying only that it not comfortable with the Bank lending to existing borrowers.

26. Despite the Bank addressing each and every additional request from the FDIC associated with the Bank's various strategic plan submissions, not one of the various plans submitted in the last four (4) years have received FDIC non-objection. Further, the FDIC has asserted that the Bank's failure to have an approved strategic plan is itself a regulatory violation, one that the FDIC claims completely bars the Bank from ceasing banking operations.

**FDIC Takes the Position That Independence Cannot Wind Down Its Operations Until the FDIC Decides That No Regulatory Matters Remain Outstanding But Repeatedly Refuses to Identify the Legal Basis for This Position**

27. On or about February 9, 2023, the Bank submitted correspondence to the FDIC, specifically to Kymberly Copa, Deputy to the Chairman and Chief of Staff of the FDIC and to Doreen Eberley at the FDIC's Division of Risk Management Supervision. The purpose of this

correspondence was to once again provide notice to the FDIC that the Bank had "reluctantly commenced a process to voluntarily terminate its FDIC insured status and banking charter which according to our Strategic Plan is targeted to be completed by June 30, 2023" and to ask the FDIC to identify in writing the specific legal basis for its insistence that the Bank cannot wind down its banking operations.  The letter also raised yet again the Bank's concern that it was being treated unjustly by the FDIC:

> The Independence Board of Directors, Senior Management, and Shareholders [have] endured for over three years what is believed to be a combination of regulatory bad faith, breach of confidentiality, conflict of interest, violations of the FDIC Code of Ethics and an obvious lack of authenticity and despite dedicated and relentless efforts and expense have been unable to satisfactorily resolve a single regulatory concern.

28. The FDIC's short response, sent on February 22, 2023, simply recycled the FDIC's previously-stated position that it will not allow the Bank to voluntary terminate its deposit insurance until the FDIC determines that all regulatory matters have been "satisfactorily resolved," and further that *even the letter setting forth the FDIC's position* was confidential.  To assert such sweeping authority without any underlying statutory or regulatory support is troubling, but to do so while insisting that *the FDIC's legal position is itself a secret* is shocking. Secret rulemaking targeting one specific regulated entity — while denying that entity even the ability to disclose the secret rulemaking — is the definition of regulatory bad faith and provides strong indicia that the FDIC is knowingly and intentionally trying to harm the Bank and therefore seeks to cloak even its legal positions from any objective scrutiny.

29. Despite multiple requests from the Bank for clarification on what statute or regulation sets forth the "rule" requiring a delay in termination of insured depository institution operations until all outstanding regulatory matters are resolved to the FDIC's satisfaction, as of

13

the filing of this Complaint, the FDIC still has not provided any applicable legal citation or authority in support of this position.

30. As a result of the FDIC's apparent and ongoing vendetta against the Bank, and its unlawful, arbitrary and capricious secret rulemaking, the Bank has been directly and permanently harmed. FDIC's actions are in direct contravention of the agency's own regulations and have unlawfully deprived the Bank of its liberty interest without due process of law, solely for the apparent purpose of causing harm to an insured institution.

31. The Bank is not seeking special treatment from the FDIC or this Court, or an exception to any rule or regulation. It simply seeks the application of the FDIC's own rules and regulations as they would be applied to any other insured financial institution, including the ability to wind down its operations according to those rules and state law. This is what the Bank has repeatedly requested that the FDIC allow. To date, FDIC has refused those requests, and indeed has gone to great lengths to avoid addressing them directly. This cannot continue without millions in dollars in unnecessary expenses borne by the Bank simply to operate as the very "dormant bank" that the OCC's Comptroller's Licensing Manual warns against creating.

32. To add insult to injury, after recently changing course and informing the Bank's board and management at an in-person report of examination exit interview on October 4, 2023 that they were *not* prohibited from notifying the remaining depositors of the Bank's intent to no longer accept deposits as part of its plan to wind down operations, the FDIC then reversed course again and informed the Bank that they will in fact be required by the FDIC to maintain a minimum level of deposits or be at risk of further regulatory scrutiny—presumably resulting in ever-more assertions that they cannot wind down operations.

## COUNT I
## DECLARATORY RELIEF

33. Plaintiff re-alleges the allegations set forth in paragraphs 1-32 as if the same were set forth fully herein and incorporate the same by reference.

34. The rights, status, and legal standing of the parties are governed by their course of conduct and dealing, the attendant facts and circumstances, R.I. Gen. Laws, 12 U.S.C. §§ 1818, common law and applicable case law, respectively.

35. A dispute has arisen in connection therewith.

36. The Plaintiff has reasonably relied on the attendant facts and circumstances, the parties' course of conduct and dealing, 12 U.S.C. § 1818, and the representations of the FDIC in connection with its efforts to wind-down operations, to its detriment.

WHEREFORE, Plaintiff, Independence Bank respectfully prays that this Court enter an Order having the effect of a final judgment which provides as follows:

a. A declaration, pursuant to R.I. Gen. Laws § 9-30-1 and 12 U.S.C. §§ 2201, *et seq.*, respectively, that there is no law or regulation requiring that all outstanding regulatory matters be completed "to the satisfaction of the FDIC" prior to a regulated institution beginning a winddown and liquidation process under the Federal Deposit Insurance Act or state law;

b. A declaration, pursuant to R.I. Gen. Laws § 9-30-1 and 12 U.S.C. §§ 2201, *et seq.*, respectively, that the Strategic Plan revisions submitted by the Bank satisfied the requirements for such submissions set forth in the 2019 Consent Order, ¶ 3(a);

c. A declaration, pursuant to R.I. Gen. Laws § 9-30-1 and 12 U.S.C. §§ 2201, *et seq.*, respectively, that the FDIC's conduct with respect to Independence Bank's Strategic Plan submissions and its intent to winddown and terminate its deposit insurance is outside

the FDIC's statutory authority, arbitrary and capricious, in direct contravention of the FDIC's own regulations, and unlawfully deprives Plaintiff of its liberty interests without due process of law;

    d. An award to Plaintiff for any and all costs and expenses incurred by the Plaintiffs in the preparation and prosecution of the within Complaint, including without limitation all attorneys' fees;

    e. An award to Plaintiff of such other and further relief as this Court may deem fair, just, and reasonable.

    WHEREFORE, Plaintiff, Independence Bank demands judgment against Defendant, Federal Deposit Insurance Corporation plus costs and attorneys' fees.

DATED:  October 27, 2023

PLAINTIFF,
INDEPENDENCE BANK

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

 /s/ Travis J. McDermott
Travis J. McDermott (#8738)
40 Westminster Street, Suite 1100
Providence, RI  02903
(401) 861-8200
(401) 861-8210 FAX
tmcdermott@psh.com

4541701.2/8744-1