**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| INDEPENDENCE BANK<br><br>        Plaintiff,<br><br>v.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION, and RHODE ISLAND DEPARTMENT OF BUSINESS REGULATIONS,<br><br>        Defendants. | Case No. 1:23-cv-00447-JJM-PAS |

**FEDERAL DEPOSIT INSURANCE CORPORATION'S
MEMORANDUM OF LAW IN SUPPORT
OF CROSS-MOTION FOR SUMMARY JUDGMENT**

FEDERAL DEPOSIT INSURANCE CORPORATION
Andrew Dober
Senior Counsel

Erik Bond
Counsel
3501 Fairfax Drive
Arlington, VA 22226-3500
Tel.: (703) 562-6477
Fax: (703) 562-2477
Email: erbond@fdic.gov

DATED: July 15, 2024

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................1

STATEMENT OF FACTS .......................................................................................................2

    A.   The FDIC Enters Into a Consent Order with the Bank. ................................2

    B.   The FDIC's Examination Finds Significant Violations. ...............................3

    C.   The Bank Applies for Voluntary Termination of its Insurance. ..................4

    D.   The FDIC Initiates an Enforcement Proceeding Against the Bank. ...........4

    E.   The FDIC Declines to Consent to the Termination Application. ................5

ARGUMENT ...........................................................................................................................6

  I.   The Court Lacks Jurisdiction to Issue an Order Affecting the FDIC's Enforcement Proceeding. ...............................................................................6

    A.   The Case Law Shows That Section 1818(i)(1) Means What it Says. .........7

    B.   Section 1818(i) Bars the Remedies Sought in the Amended Complaint. ...10

  II.  The FDIC's Denial of the Bank's Termination Application Was Lawful and Proper. .....12

    A.   The FDIC Explained its Reasoning. ...........................................................13

    B.   The FDIC Relied on the Appropriate Statutory Factors. ............................14

        1.   Allowing Immediate Termination of Insurance Would Have Rendered the Bank's Capital Inadequate. ...........................................................14

        2.   Management's Deficiencies Made Immediate Termination Inappropriate.15

        3.   Immediate Termination of Insured Status Would Not Serve the Community. ...........................................................15

        4.   Immediate Termination Would Be At Odds with the Federal Deposit Insurance Act. ...........................................................16

    C.   No Escrow Arrangement Can Ensure Payment of the Bank's Obligations. ..............18

  III.  The Bank's Challenge to the FDIC's Strategic Plan Objections Identifies No Final Agency Action or Agency Inaction and is Moot. ...........................................................19

  IV.  The Bank's Constitutional Challenge is Meritless……………………………………….23

CONCLUSION .......................................................................................................................24

i

**PRELIMINARY STATEMENT**

Plaintiff Independence Bank (the "Bank") entered into a Consent Order with the FDIC and the Rhode Island Division of Bank Regulation ("RIDBR") in 2019 to correct myriad violations in the Bank's Small Business Administration ("SBA") lending program, violations that both harmed the Bank and injured the program's borrowers. SOF ¶ 1.[1] Among other things, the Bank agreed, as long as the Consent Order was in place, not to "declare or pay any dividend" to the Bank's shareholders absent regulatory approval. AR 0010. The Bank's controlling shareholders—CEO Robert Catanzaro and his family trust—therefore cannot currently liquidate the Bank's capital reserves and turn them into their personal assets. Termination of the Bank's insured status would vacate the Consent Order and end the dividend restriction. Further, the FDIC has now commenced an administrative enforcement proceeding against the Bank seeking restitution to the victims of the Bank's lending violations. But if the Bank were to cede its status as an "insured depository institution," the agency's administrative jurisdiction would vanish because the Bank would no longer be an insured depository institution.

This Court lacks jurisdiction to hear this matter. Congress has prohibited courts from "affect[ing] by injunction or otherwise" the FDIC's enforcement proceedings and any orders issued in connection with those proceedings, 12 U.S.C. § 1818(i)(1), and there can be no question that immediate self-liquidation of the Bank would "affect" the pending enforcement proceeding against the Bank and the Consent Order that has governed the Bank's operations since 2019. Directing the FDIC to grant the Bank's application for termination of insured status

---

[1] Factual citations here refer to the FDIC's Statement of Undisputed Facts ("SOF"), which is being filed contemporaneously herewith, and the FDIC's Administrative Record ("AR"), whose index was filed with the Court on April 1, 2024. The parties will provide the Court with a joint appendix of relevant portions from the Administrative Record following the close of briefing.

would mean that the Bank no longer exists, and as the FDIC brought its enforcement action under a provision providing for restitution by an "insured depository institution," *id.* § 1818(b)(6), the FDIC's administrative jurisdiction to hear that matter would lapse upon the Bank's termination. The Bank wants the Court to stop the FDIC's proceeding in its tracks, and § 1818(i)(1) forestalls such judicial interventions in the FDIC's enforcement matters. Summary judgment for the FDIC is therefore appropriate.

Should the Court reach the merits (and it should not), summary judgment for the FDIC on the substance of this dispute is called for. The bone of contention here is not *whether* the Bank will formally cease operations—it will—but *when*. Indeed, the Bank holds no loans and is accepting no new deposits; it has largely shut down already. The question on the merits is therefore whether Mr. Catanzaro (himself the subject of a pending FDIC proceeding for prohibition from the banking industry and civil money penalties) and other shareholders should be permitted to walk away with the Bank's remaining reserves, or whether a portion of those reserves should be kept in place for a potential restitution award to borrowers injured by the Bank's misconduct, many of whom reside in Rhode Island. The FDIC, in withholding its consent to immediate closure of the Bank, chose the latter course. The Court should uphold that determination as consistent with the law and neither arbitrary nor capricious, and grant summary judgment to the FDIC.

## STATEMENT OF FACTS

### A.     The FDIC Enters Into a Consent Order with the Bank.

On July 25, 2019, the Bank entered into a Consent Order with the FDIC (and the State of Rhode Island) regarding the management of the Bank's SBA lending program. SOF ¶ 1. The Bank had operated that program since 2013, originating SBA Small Loan Advantage loans for borrowers with questionable credit profiles and selling the guaranteed portions of those loans on

the open market at a premium. SOF ¶ 2. The FDIC had previously identified significant weaknesses in the program, including a failure to manage the size of the Bank's loan portfolio and create a risk management framework for the loans, and a failure to police the third parties that sourced the Bank's SBA loans. SOF ¶ 3.

In the Consent Order, the Bank agreed to address the deficiencies in its SBA lending program, and to submit a strategic plan for prospective management of the program consistent with sound banking practices. SOF ¶ 4. Specifically, the Bank agreed that its strategic plan would address its concentration of SBA loans as a percentage of its total capital, overall capital ratios accurately reflecting the Bank's risk profile, identification of risks arising from the program, and balance sheet and income statements for the years covered by the plan. *Id.*

The SBA suspended the Bank's origination of SBA loans in 2019, and in 2021 the Bank voluntarily agreed not to originate any more SBA loans. SOF ¶ 6.

The Bank has submitted various strategic plans to address the matters raised in the Consent Order, and the FDIC has deemed them insufficient. SOF ¶ 7.

**B.     The FDIC's Examination Finds Significant Violations.**

In January 2022, the FDIC's Division of Depositor and Consumer Protection ("DCP") reviewed a large sample of the Bank's SBA loans originated in 2017, 2018, and 2019. SOF ¶ 8. That review found, *inter alia*, that the bank had improperly charged fees to SBA borrowers for services never rendered, had improperly packaged fees rather than itemizing them, had charged borrowers for underwriting services despite an SBA prohibition on such charges, and had charged for legal expenses on a flat-fee rather than an hourly basis, again in violation of SBA regulations. *Id.* The FDIC also found that the Bank had made deceptive representations to its customers regarding the fees charged and the SBA's authorization of those fees. SOF ¶ 10. The FDIC's review suggested that the Bank had received as much as $6.9 million in impermissible

fees. SOF ¶ 11. The FDIC identified those fees as potential deceptive acts and practices in violation of Section 5 of the Federal Trade Commission Act ("Section 5"). SOF ¶ 11. The FDIC sought voluntary restitution from the Bank, but the Bank declined to pay. SOF ¶ 11.

### C.    The Bank Applies for Voluntary Termination of its Insurance.

Instead of addressing these concerns, the Bank informed the FDIC on February 9, 2023, that it intended to stop doing business altogether. SOF ¶ 12. Specifically, the Bank informed the FDIC that it had stopped accepting new deposits and had sold its loan portfolio. *Id.* The FDIC informed the Bank that the termination process could not begin until the Bank's outstanding regulatory obligations were satisfied. *Id.*

The Bank formally sought permission to terminate its insured status on September 6, 2023. SOF ¶ 13. The Bank stated that, while it was losing approximately $300,000 per month due to overhead costs now that commercial activities at the Bank had largely ceased, it still had approximately $28 million in liquidity and a capital ratio of approximately 6.7%. *Id*. The FDIC again informed the bank that the termination could not proceed while the Bank had outstanding regulatory obligations, including that, in Enforcement Counsel's view, the Bank owed millions of dollars in restitution to customers and borrowers of the Bank. SOF ¶ 14.

### D.    The FDIC Initiates an Enforcement Proceeding Against the Bank.

On November 9, 2023, the FDIC filed a Notice of Charges against the Bank, alleging that the Bank had improperly charged SBA borrowers fees for services not performed and imposed fees prohibited by SBA regulations, as described above. SOF ¶ 15. The FDIC contended that these fees constituted Section 5 violations and sought a cease and desist order under § 1818(b) that included restitution to the affected borrowers. AR 2046. The proceeding remains pending before an FDIC Administrative Law Judge, and no hearing has been held to date. The FDIC has brought a separate enforcement action regarding these violations against CEO Catanzaro, and an

institution-affiliated party, John C. Ponte, who was responsible for originating the bulk of the SBA loans at issue.[2] SOF ¶ 16.

### E.    The FDIC Declines to Consent to the Termination Application.

On December 5, 2023, the FDIC's Board of Directors issued a decision ("Decision") that rejecting the Bank's application and declining to consent to the Bank's request for voluntary termination of its insured status. SOF ¶ 17. The Decision stated that, when the FDIC receives such an application, it is required to consider the factors set forth in 12 U.S.C. § 1828(i)(4), namely (1) the financial history and condition of the depository institution; (2) the adequacy of the depository institution's capital structure; (3) the future earnings prospects of the depository institution; (4) the general character and fitness of the management of the depository institution; (5) the convenience and needs of the community to be served by such depository institution; and (6) whether terminating the depository institution's corporate powers would be consistent with the purposes of the Federal Deposit Insurance Act ("FDIA").[3] *Id*.

The Decision noted staff's recommended findings that factors (2), (4), (5), and (6) under § 1828(i)(4) did not favor termination, while factors (1) and (3) did support termination. SOF ¶ 18. Specifically, staff had noted that the Bank had adequate capital for its current needs, including payments of any restitution orders, but would not have sufficient capital to make those payments if prompt termination were permitted. *Id*. Deficiencies in the management of the Bank, specifically the Bank's inability to prepare a viable strategic plan to satisfy its regulatory obligations, likewise favored denying the application pending submission of an acceptable plan.

---

[2] Former Executive Vice President of the Bank Danielle Desrosiers stipulated to order under Section 8(e) of the FDI Act, and the notice of charges filed against her was dismissed.
[3] The Board also identified as a consideration the overall risk to the Deposit Insurance Fund, consistent with the statutory direction to consider such risk in its supervision of insured institutions, *see* 12 U.S.C. § 1817(b)(1), but did not specifically invoke that factor in its Decision.

SOF ¶ 19. The convenience and needs of the community would not be served by immediate

termination, the staff found, as the SBA borrowers that had been affected by the violations

identified in the Consent Order would be left with nothing. SOF ¶ 20. For the same reason, staff

concluded, allowing the Bank to self-liquidate and ignore its outstanding obligations would not

serve the requirements set forth by law which call for meaningful corrective action and

accountability for insured depository institutions, and their affiliates, who violate the law and

engage in unsafe and unsound practices. SOF ¶ 21. The poor financial condition of the Bank and

its dim prospects for future earnings favored termination, in staff's view, but staff's overall

recommendation deemed those factors outweighed by the considerations disfavoring FDIC

consent. SOF ¶ 22. The Board's Decision adopted those recommended findings, and deemed it

appropriate to maintain the Bank's insured status until the Bank "submit[t]ed an acceptable

strategic plan outlining how the Bank will address its outstanding regulatory issues, and (2)

successfully resolves its outstanding obligations, including restitution to its customers." SOF ¶

23. The Bank filed an Amended Complaint in this action on January 30, 2024, alleging that the

FDIC's Decision was arbitrary, capricious, and contrary to law under 5 U.S.C. § 706.[4]

## ARGUMENT

**I.    The Court Lacks Jurisdiction to Issue an Order Affecting the FDIC's Enforcement Proceeding.**

"[N]o court [has] jurisdiction to affect by injunction or otherwise the issuance" of

enforcement orders or to "review" or "modify" the same. 12 U.S.C. § 1818(i)(1). Section 1818(i)

strips this Court of authority to issue relief interfering with the FDIC enforcement proceeding

seeking restitution. *Ponte v. FDIC*, 673 F. Supp. 3d 145 (D.R.I. 2023) (*"Ponte I"*) (applying §

---

[4] The Complaint originally filed in this action challenged the FDIC's withholding of its decision on the Bank's termination application under the APA. ECF 1.

1818(i) and dismissing claims brought against FDIC *and* the Bank as co-defendant). All of the relief Plaintiff seeks in this case—whether directed to the FDIC or to the RIDBR—is targeted at interference with the pending FDIC administrative enforcement. The Complaint boils down to asking permission from this Court for the Bank to terminate its insured status, and exit the banking industry altogether. That would mean that there is no insured depository institution against which an § 1818(b) cease and desist and restitution proceeding could proceed, and it would allow capital to be distributed to shareholders and make it unavailable to satisfy regulatory responsibilities. Because granting this relief would undoubtedly "affect by injunction or otherwise" the ongoing administrative enforcement case, 12 U.S.C. § 1818(i)(1) bars litigation in this Court.

There is no subject-matter jurisdiction, and dismissal under Rule 12(b)(1) is appropriate.

A.    **The Case Law Shows That Section 1818(i)(1) Means What it Says.**

The Financial Institutions Supervisory Act of 1966 ("FISA"), Pub. L. No. 89-695, 80 Stat. 1028, 12 U.S.C. § 1818, established a "tripartite regime of judicial review" for FDIC enforcement actions. *See Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin. Inc.*, 502 U.S. 32, 38 (1991) (discussing 12 U.S.C. § 1818). Under this framework, federal courts have subject-matter jurisdiction to review or affect FDIC enforcement actions in only three circumstances. First, the statute permits the FDIC and other federal banking agencies to petition district courts for "the enforcement of any effective and outstanding notice or order issued [to an insured bank]" under Section 8 proceedings. 12 U.S.C. § 1818(i)(1). Second, district courts have jurisdiction to review challenges by bank directors and institution-affiliated parties to the FDIC's temporary suspension of deposit insurance, an agency's issuance of an emergency temporary cease and desist order, or a temporary suspension of an institution-affiliated party while a proceeding is pending. 12 U.S.C. § 1818(a)(8)(D), (c)(2), (f). Third, the United States Courts of Appeals are

vested with exclusive jurisdiction to review final agency orders issued in these proceedings. *See id.* § 1818(h)(2).

Outside these specifically delineated circumstances, federal courts lack subject-matter jurisdiction to interfere with FDIC enforcement proceedings. This is not merely implicit from the structure of Section 1818. Rather, in language that the Supreme Court described as "plain" and "preclusive," *MCorp*, 502 U.S. at 39, Section 1818(i)(1) provides that (with exceptions not relevant here) "no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of **any** notice or order under [section 1818], or to review, modify, suspend, terminate, or set aside any such notice or order." 12 U.S.C. § 1818(i)(1) (emphasis added); *see also Ponte I,* 673 F. Supp. 3d at 150.

In *MCorp*, a bank holding company petitioned a district court for an injunction barring the Board of Governors of the Federal Reserve System from continuing to pursue an administrative enforcement action against the company. *See* 502 U.S. at 36. Citing Section 1818(i)(1), the Supreme Court explained that "the statute provides us with clear and convincing evidence that Congress intended to deny the District Court jurisdiction to review and enjoin the [Federal Reserve] Board's ongoing administrative proceedings." *MCorp*, 502 U.S. at 44; *see also Doral Bank v. FDIC*, 59 F. Supp. 3d 358, 367 (D.P.R. 2014) (following *MCorp* and holding that "Congress spoke clearly and directly in Section 1818(i)(1)") (internal citation omitted).

Many other federal courts have held that Section 1818(i)(1) means what it says. Judge McElroy, in fact, addressed this issue twice in 2023. *Ponte I*, 673 F. Supp. 3d at 146 (dismissing lawsuit against FDIC and the Bank in light of pending FDIC enforcement proceeding); *Ponte v. FDIC*, 2023 WL 6441976 (D.R.I. Oct. 3, 2023) ("*Ponte II*") (dismissing constitutional claims against FDIC for same reasons). In *Ponte I*, John Ponte filed suit, challenging the FDIC's

administrative jurisdiction over him, also naming the Bank as a co-defendant. While the lawsuit was pending, the FDIC commenced enforcement proceedings against him. Judge McElroy held that Section 1818(i)(1) required dismissal of claims against both the FDIC and the Bank because "[f]or the Court to adjudicate" whether or not Ponte was subject to agency jurisdiction "would surely 'affect' the enforcement proceedings[,]" and that Ponte should raise any jurisdictional challenges in the enforcement proceeding. 673 F. Supp. 3d at 150. The same reasoning applies here.

Likewise, in *Bonan v. FDIC*, No. 23-cv-00008, 2023 WL 156852 (E.D. Mo. Jan. 11, 2023), Bonan sought declaratory and injunctive relief from a FDIC enforcement action on the eve of the administrative hearing. The *Bonan* court dismissed the case for lack of subject matter jurisdiction, holding that "12 U.S.C. § 1818(i)(1) *explicitly* divests this Court of jurisdiction to grant the injunctive and declaratory relief sought" and "clearly and directly demonstrates a congressional intent to preclude review." *Id.* at *4 (emphasis added) (citing *MCorp*, 502 U.S. at 44).

The *Ponte* and *Bonan* courts' findings that 12 U.S.C. § 1818(i)(1) explicitly precludes review are hardly unique. In *Doral Bank*, for instance, another court in this circuit dismissed a declaratory judgment action for lack of jurisdiction, holding that "the statute's clear circumscription of jurisdiction would be seriously undermined, if not rendered wholly ineffectual, were it read not to apply to this action; an action having exactly the consequence the statute was meant to prohibit." 59 F. Supp. 3d at 366. *See also Sinclair v. Hawke*, 314 F.3d 934, 941 (8th Cir. 2003) (noting that "courts have no jurisdiction to enjoin enforcement actions"); *Hindes v. FDIC*, 137 F.3d 148, 165 (3d Cir. 1998) ("[S]ection 1818(i)(1) precludes the declaratory and injunctive relief sought here."); *Henry v. OTS*, 43 F.3d 507, 512 (10th Cir. 1994)

("§ 1818(i)(1) precludes judicial review of OTS enforcement orders except under specifically enumerated circumstances."); *Bd. of Governors of Fed. Rsrv. Sys. v. DLG Fin. Corp.*, 29 F.3d 993, 999 (5th Cir. 1994) ("§ 1818(i)(1) divested the district court of jurisdiction to enjoin the commencement of the Board's administrative enforcement."); *Greenberg v. OCC*, 938 F.2d 8, 11-12 (2d Cir. 1991) ("[T]he circumstances of the instant case require adherence to the normal requirement of exhaustion of administrative procedures. That is the obvious purport of section 1818(i)(1)."); *Abercrombie v. OCC*, 833 F.2d 672, 675 (7th Cir. 1987) ("According to § 1818's plain language, the district court simply had no jurisdiction to enjoin the administrative proceedings.").[5]

### B.    Section 1818(i) Bars the Remedies Sought in the Amended Complaint.

The amended complaint asks this Court to: (1) set aside the FDIC Board's determination declining to consent to IB's request to exit the banking business; (2) declare that both the FDIC and the RIDBR violated IB's Fifth Amendment rights by failing to allow IB to exit the banking business; and (3) issue some 13 declaratory rulings, vacating the FDIC Board determination and requiring RIDBR to take action, which declarations would short-circuit the FDIC's pending enforcement case and allow IB to immediately liquidate. ECF 12. In other words, all of the

---

[5] *See also Kraft v. OCC*, No. 4:20-CV-04111-RAL, 2021 WL 1251393, at *5 (D.S.D. Apr. 5, 2021) (under § 1818(i)(1), "[w]hen the OCC issues [a consent] order, courts do not have jurisdiction over that order except in very limited circumstances, none of which are applicable here"); *Harris v. CitiMortgage, Inc.*, No. 3:13-CV-783-JHM, 2014 WL 12788951, at *2 (W.D. Ky. May 13, 2014) (agreeing that "the Court does not have jurisdiction over Plaintiff's cause of action because Congress has expressly prohibited direct judicial review of orders issued under § 1818"); *Horvath v. FDIC*, 20 F. Supp. 2d 844, 849 (E.D. Pa. 1998) ("Inasmuch as the statute clearly provides that exclusive jurisdiction for review of the FDIC's decision rests with the Court of Appeals, we find plaintiff's request for injunctive relief to be in direct contravention of both 12 U.S.C. § 1818(h)(1), (2) and § 1818(i)."); *First Nat'l Bank of Chicago v. Steinbrink*, 812 F. Supp. 849, 852 (N.D. Ill. 1993) ("[T]he clarity of the congressional preclusion of review in § 1818(i)(1), coupled with the meaningful and adequate opportunity for judicial review by the court of appeals following a final administrative order, provide[s] clear and convincing evidence that Congress intended to deny the District Court jurisdiction to review and enjoin the [] ongoing administrative proceedings." (alterations in original) (citations omitted)).

requested relief is aimed at interfering with the agency's ongoing enforcement proceeding seeking restitution. *See Ponte I*, 673 F. Supp. 3d at 150-51; *Doral Bank*, 59 F. Supp. 3d at 366 (refusing plaintiff's request for declaratory and injunctive relief because it would interfere with 1818(i)'s "blanket prohibition" and "clear circumscription of jurisdiction"). This is because the Bank would use any favorable substantive ruling here to immediately wind down and distribute its assets to shareholders. That would neuter the pending FDIC enforcement case, asthere would no longer be an insured depository institution against which a cease and desist order could issue. Congress specifically barred the use of district courts for mounting this type of collateral attack. 12 U.S.C. § 1818(i)(1).

Nor would there be any merit in an argument that this Court should issue the rulings the Bank seeks here because Congress specifically provided for such jurisdiction under the APA. The APA provides for review of a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The APA, however, "does not allow judicial review where another statute specifically prohibits it." *Hindes*, 137 F.3d at 163 (citing 5 U.S.C. § 701(a)(1)). Here, APA review "would affect by injunction or otherwise" the FDIC's pending enforcement case seeking restitution because it would involve whether the FDIC Board determination denying consent for IB to cede depository insurance should be vacated. *See id.* ("APA review is unavailable in this case also because 12 U.S.C. § 1818(i) precludes judicial review of the Notification, and the APA does not allow judicial review where another statute specifically prohibits it"); *DeNaples v. OCC*, ]No. 09-cv-1802, 2010 WL 457134 (M.D. Pa. Feb. 4, 2010) (dismissing APA claim under 12 U.S.C. § 1818(i) in light of ongoing OCC enforcement proceeding), *aff'd*, 404 F. App'x 609 (3d Cir. 2010).

Further, Section 1818(i)(1)'s jurisdictional bar applies to all of the claims in the amended complaint, including claims against RIDBR because all of the claims would "affect" the FDIC's enforcement case. Judge McElroy has recognized that this is the proper approach, dismissing not only Ponte's claims against the FDIC but also his claims against the Bank. *Ponte I*, 673 F. Supp. 3d at 152; *see also Telematics International, Inc. v. NEMLC Leasing Corp.,* 967 F.2d 703, 707 (1st Cir. 1992) (holding jurisdictional bar under 12 U.S.C. 1821(j) applied to preclude claims against third party, which would have the same effect as if brought directly against FDIC as Receiver); *Hindes*, 137 F.3d at 160-61 ("1821(j) precludes a court order against a third party which would affect the FDIC as receiver, particularly where the relief would have the same practical result as an order directed against the FDIC in that capacity.").

The Bank can recommence this litigation in this Court once the enforcement case concludes. But Congress made clear that "no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order . . . or to review, modify, suspend, terminate, or set aside any such notice or order." 12 U.S.C. § 1818(i)(1). Judicial declarations from this Court as to either the FDIC or RIDBR would affect the FDIC's administrative proceeding. In the alternative, this case should be stayed pending final resolution of the pending enforcement proceeding seeking restitution.

## II.    The FDIC's Denial of the Bank's Termination Application Was Lawful and Proper.

On the merits, the FDIC's denial of the Bank's application for termination of its insured status was consistent with the law and was neither arbitrary nor capricious. To the contrary, it was plainly correct.

When a bank seeks to voluntarily terminate its insured status pursuant to 12 U.S.C. § 1818(a)(1), the FDIC must consent for the termination to be effective. *Id.* § 1828(i)(3). The statute directs the FDIC to consider the following factors in "granting or withholding consent":

"(A) the financial history and condition of the bank,
"(B) the adequacy of its capital structure,
 "(C) its future earnings prospects,
"(D) the general character and fitness of its management,
"(E) the convenience and needs of the community to be served, and
"(F) whether or not its corporate powers are consistent with the purposes of this chapter."

*Id.* § 1828(i)(4). The FDIC conducted that analysis here, considering each of the statutory factors and declining to consent to termination. AR 2076-84.

### A.    The FDIC Explained its Reasoning.

Review of agency action challenged as "arbitrary or capricious" under the APA, 5 U.S.C. § 706(2)(A), is extremely limited. *FCC v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 513 (2009) ("[T]his narrow standard of review [requires] an agency [to] examine the relevant data and articulate a satisfactory explanation for its action.") (citations omitted). A reviewing court does not "substitute its judgment for that of the agency," and an agency's explanation of its decision is sufficient if its "path may reasonably be discerned." *Id.* (citations omitted). The FDIC weighed the pertinent information, in particular the Bank's pending obligations, and explained the basis for its decision with more than sufficient clarity: termination would dissipate the bank's capital, management's character and fitness was belied by its failure to address the Bank's regulatory obligations, allowing the Bank to shirk its regulatory obligations would not serve the convenience and needs of the community, and the purposes of the FDIA would be undermined by the FDIC's consent to this gambit. AR 2050-61, 2078-84.[6]

---

[6] The FDIC Board relied on and adopted the recommendations of FDIC staff, *see* AR 2079, and such an incorporation of recommendations provides sufficient clarity as to the Board's reasoning. *See, e.g.*, *FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 38 n.19

**B.      The FDIC Relied on the Appropriate Statutory Factors.**

The Bank does not dispute that the FDIC's "path may reasonably be discerned" here.

Rather, the Bank contends that the FDIC relied on factors other than those set forth in §

1828(i)(4) because it pointed to the unresolved nature of the Bank's regulatory commitments in

explaining why it withheld consent to insured status termination. Bank Mem. at 9-10. As

explained below, those unresolved commitments bear directly on the statutory factors, and the

FDIC appropriately considered those commitments in its faithful application of those factors.

Nothing about that exercise was arbitrary or capricious.

1.      Allowing Immediate Termination of Insurance Would Have Rendered the
Bank's Capital Inadequate.

The FDIC considered the "adequacy of [the Bank]'s capital structure," *see* 12 U.S.C, §

1828(i)(4)(B), and found that this factor did not favor immediate termination of insured status.

Specifically, the FDIC found that, while the Bank was sustaining losses pending its ultimate

termination, it had $21 million in capital, more than enough to cover the Bank's losses of

approximately $100,000 per month in the short term. AR 1870, 2056. The FDIC also noted that

the Bank had sufficient capital to satisfy any restitution obligations to the SBA loan borrowers

that had been charged excessive or improper fees. AR 2057. Immediate termination, FDIC staff

noted, would "impede the satisfactory resolution of these matters," *id.*, as there would no longer

be an entity with responsibility to make restitution, nor could the enforcement proceeding

continue with no insured depository institution extant. For these reasons, FDIC staff properly

recommended, and the FDIC Board properly found, that the adequacy of the Bank's capital

---

(1981) (for review purposes, it was "sufficiently clear that the staff report provides the basis for
the Commission's action").

structure disfavored immediate termination of the Bank's insured status. The Bank identifies no error in that holding.

2.    Management's Deficiencies Made Immediate Termination Inappropriate.

The FDIC also considered the "general character and fitness of [the Bank's] management," *see* 12 U.S.C, § 1828(i)(4)(D), and likewise found that this factor disfavored immediate insured status termination. In particular, the FDIC expressed concern about the capacity of the Bank's management to execute an adequate self-liquidation plan, and noted that the existing plan contained numerous deficiencies. AR 1868-69, 2058. Those deficiencies included a failure to address any restitution obligations arising from the SBA loan violations, along with a transition plan for the Bank's SBA servicing obligations and a wind-down of the Bank's IT contracts. *Id.* The Bank may disagree with these assessments, but they were neither arbitrary nor capricious and were rendered within, not outside, the statutory framework.

3.    Immediate Termination of Insured Status Would Not Serve the Community.

The requirement that the FDIC consider the "convenience and needs of the community to be served," *see* 12 U.S.C, § 1828(i)(4)(E), coincides in substantial part with the Community Reinvestment Act analysis, and the FDIC found that the Bank's Substantial Noncompliance CRA rating pointed to an unfavorable finding on this issue. AR 0325-30, 2058, 2079. The Bank's SBA violations, and in particular the impermissible fees the Bank charged SBA borrowers, did not serve the convenience and needs of the portion of the community seeking credit, and the Bank neither developed sufficient policies to prevent these violations nor adopted a corrective action plan to cure them. *Id.* Here as well, allowing the Bank to self-liquidate with the violations outstanding and unaddressed would have been a direct and unjustifiable disservice to the community's needs. FDIC staff noted specifically that immediate termination would mean

15

distribution of the Bank's remaining capital reserves to the Bank's shareholders, while any potential recipients of restitution awards would receive nothing. *Id.*; AR 0321-22. Given that, and the absence of a plan to transition the Bank's SBA servicing obligations to another institution, FDIC staff reasonably concluded that immediate termination would not serve the convenience and needs of the community, AR 2013-14, 2058-59, and the Board agreed. AR 2079. The Bank identifies nothing arbitrary or capricious about these conclusions.

### 4. Immediate Termination Would Be At Odds with the Federal Deposit Insurance Act.

The FDIC also found that immediate termination would be inconsistent with the purposes of the FDIA, *see* 12 U.S.C. § 1828(i)(4)(F), as such a step would allow the Bank to evade responsibility for its misconduct. Insured institutions' accountability for violations of laws and regulations is enforced via administration actions under § 1818, an important part of the FDIA's regulatory scheme, and that scheme involves remedies to parties wronged by unlawful conduct. *See id.* § 1818(b)(6), 1818(i). Allowing an institution to self-liquidate and thereby escape accountability under that scheme, and in particular avoid potential restitution obligations and distribute capital to its shareholders rather than the victims of its misbehavior, would undermine confidence in that enforcement mechanism specifically and in the banking system more generally. For those reasons, FDIC staff recommended, and the Board adopted, a finding that this consideration did not support immediate termination of the Bank's insured status.

Finally, FDIC staff considered the two remaining factors identified in § 1828(i)(4) (the financial condition of the Bank and its future earnings prospects) and found that they favored permitting immediate termination, but ultimately found those considerations outweighed by the four factors discussed above. The Board adopted that analysis, and this Court should not disturb the Board's decision, as this is precisely the sort of weighing of statutory factors that agencies

are given broad discretion to conduct under the APA. *See, e.g.*, *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976); *see also Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 289 (4th Cir. 1999) (mere disagreement with agency conclusions does not render them arbitrary or capricious). The Bank points to nothing arbitrary or capricious in this aspect of the FDIC's determination.

Notably, and consistent with all of the above, the Second Circuit has held that banks may not use the termination process to escape their regulatory responsibilities. In *Meriden Trust & Safe Deposit Co. v. FDIC*, 62 F.3d 449 (2d Cir. 1995), an institution sought to avoid cross-guarantee liabilities for the losses of an affiliated bank under 12 U.S.C. § 1815(e), arguing that it had ceased to accept deposits and was therefore no longer a bank. *Id.* at 453. The Second Circuit rejected that attempt and rebuffed "the premise that an insured financial institution, and not the FDIC, determines when that institution ceases its insured status," noting that § 1828(i)(3) requires the FDIC's consent and that institutions cannot "change their status from 'insured' to 'noninsured' at will." *Id.* Just as the institution in *Meriden Trust* was not permitted to give up its insured status to avoid its statutory responsibility for an affiliate's losses, the Bank should not be permitted to terminate its insurance in order to avoid restitution obligations.

The Bank argues that the enforcement proceeding has not yet resulted in a restitution judgment, Bank Mem. at 19, but that is irrelevant. Nothing in the Decision assumed that it would. Rather, the FDIC recognized that allowing the Bank's responsibility for such a judgment, if any, to be fully adjudicated and ultimately enforced required keeping the Bank open; conversely, allowing the Bank to close prematurely, short-circuit the administrative proceeding and avoid any possibility of a restitution judgment would be unfair to the individuals and entities

that stand to be made whole by such a judgment. It is the Bank, not the FDIC, that would have the Court assume the result of that proceeding.

The true basis of the Bank's objection to the FDIC's determinations is not, in fact, that the FDIC misevaluated the statutory considerations, it is that the FDIC applied those considerations at all. At various points in its filing, the Bank complains that the § 1828(i)(4) factors are inapt for circumstances where a bank intends to cease operating, rather than continue operating without deposit insurance. *See, e.g.*, Bank Mem. at 16 ("[T] the Section 18(i)(4) factors make no logical sense whatsoever concerning a ***liquidating*** entity."); *id.* at 17 ("Future earnings prospects, management's fitness, and the convenience and needs of community to be served (in the future) make little sense as applied to an entity seeking consent to go out of business."); *id.* at 28 (statutory factors create "perverse incentives"). The Bank is entitled to that view and is free to take it up with Congress, but the FDIC and this Court must apply the law as it stands, and nothing in the statute gives the FDIC latitude to ignore § 1828(i)(4) and devise its own test for these circumstances.[7]

### C.      No Escrow Arrangement Can Ensure Payment of the Bank's Obligations.

Finally, the Bank's argument that its outstanding regulatory obligations can be sufficiently addressed through an escrow arrangement is incorrect. *See, e.g.*, Bank Mem. at 19. Permitting the Bank to convert to noninsured status and withdraw its charter would by definition

---

[7] For the same reason, the Bank's invocation of a dissenting opinion (whose language the Bank borrows without citation, Bank Mem. at 28) does not identify anything arbitrary or capricious about the FDIC's decision. Vice Chairman Hill takes the view that "the factors listed in Section 18(i)(4)4 do not make any sense for analysis of whether an institution should be permitted to cease operations and are clearly intended for institutions that will remain in business." AR 2087. Congress may address that concern at the appropriate time, but the FDIC cannot rewrite the statute to accommodate it. Likewise, the dissent's view that "there should be a way" for a voluntarily liquidating institution to place funds in escrow does not allow the FDIC to overcome the statutory limits on its jurisdiction in order to create such a mechanism from scratch. *See infra* at 18-19.

mean that no restitution payments can ever be made, because the FDIC would no longer have jurisdiction to pursue the enforcement proceeding against the Bank.

The statute at issue—12 U.S.C. § 1818(b)(6)—provides that the FDIC may bring actions for restitution against an "insured depository institution" to "correct or remedy any conditions resulting" from the institution's violations of laws or regulations, or unsafe and unsound practices. The statute does not provide for actions against former insured depository institutions, however, and indeed the FDIC has specifically noted that its jurisdiction is tied to the institution's insured status. In re Meriden Trust & Safe Deposit Co., FDIC-92-241kk, 1993 WL 853696 (FDIC Sept. 21, 1993), the FDIC recognized that insured depository status is a "preliminary jurisdictional issue," and went on to hold that absent the FDIC's express written permission under 28 U.S.C. § 1828(i)(3) to convert to noninsured status, the respondent "remain[ed] an insured depository institution."[8] Thus, the FDIC's consent vel non to an application for termination of insurance determines whether there is continuing jurisdiction over enforcement matters under § 1818, and the statute does not contain any exceptions to that jurisdictional prerequisite allowing the FDIC to proceed against former institutions in order to obtain escrowed funds. Were the FDIC to grant the Bank's application for termination of insurance, the enforcement proceeding would terminate immediately, and for that reason, the Bank's promise to place funds in escrow is hollow: the funds would never be paid, because the only entity with authority to adjudicate the restitution issue, the FDIC, would lack jurisdiction to resolve the dispute.

**III.    The Bank's Challenge to the FDIC's Strategic Plan Objections Identifies No Final Agency Action or Agency Inaction and is Moot.**

---

[8] The statute in fact provides for actions against former affiliates of insured depository institutions, without regard to whether the institutions remain insured, see 12 U.S.C. § 1818(i)(3), but not against former depository institutions.

The Bank argues separately that the FDIC improperly refused to approve the Bank's various strategic plans submitted in the wake of the Consent Order. Bank Mem. at 27. That challenge fails in multiple respects.

First, the Bank asserts without explanation that the FDIC acted unreasonably in refusing consent. *Id.* Bare assertion does not show that agency action is arbitrary or capricious, however, *see, e.g.*, *Daniel v. INS*, 528 F.2d 1278, 1280 (5th Cir. 1976) ("mere naked assertions" insufficient), and a review of the record shows that the FDIC's rejection of the Bank's proposed strategic plans was fully explained and amply supported. On one occasion, the FDIC pointed out that the strategic plan needed to be updated to account for the sale of the Bank's loan portfolio and other outstanding supervisory matters, an eminently reasonable request, and harmonized with the Bank's current financial outlook. AR 0314. On another occasion, the FDIC pointed out that the strategic plan did not account for the FDIC's findings regarding improper fee assessments, and was not feasible in any event in light of the Bank's plans to self-liquidate. AR 0321. There was nothing arbitrary or capricious about those determinations.

Second, the FDIC's rejection of the Bank's proposed strategic plans was not final agency action. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) ("When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the agency action in question must be final agency action."). Nowhere did the FDIC represent that "legal consequences will flow" from the rejection of the strategic plan, *see, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted), for the obvious reason that the Bank had latitude to resubmit its plan. Nor did the letters represent the "consummation of the agency's decisionmaking process," *id.* at 177-78; rather, they pointed to

interim steps in the ongoing dialogue between the Bank and the FDIC, and thus identify mere "interlocutory" agency judgments rather than final ones. *Id.*

Third, the Bank complains of "inaction," Bank Mem. at 27, but identifies none. An agency's "fail[ure] to take a discrete . . . action that it is required to take" may sometimes be challenged under the APA when a "ministerial non-discretionary action" left undone is identified, *see Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004), but the Bank points to no statute requiring the FDIC to act on the Bank's strategic plan submissions, any such action would be highly discretionary rather than "ministerial," and in any event the FDIC *did* act on the Bank's submissions. The Bank simply disagrees with the FDIC's conclusions.

Fourth, and finally, any dispute over the FDIC's treatment of the Bank's strategic plan is largely moot. The Consent Order sought a strategic plan that would govern the Bank's continuing operations, but the Bank has disclaimed any interest in continuing to operate. *See, e.g.*, Bank Mem. at 19. The FDIC observed as much. AR 0321 ("The revised Strategic Plan, approved by the [Bank's] Board of Directors on January 27, 2023, is to seek voluntary termination of the bank's federal deposit insurance and surrender the bank's charter . . . ."). The only live issue, therefore, is whether the Bank's plan for self-liquidation is acceptable under § 1828(i)(3) and (4), and as set forth above, the FDIC has rejected it. Any former strategic plans have no continued significance and are not properly the subject of an order from this Court. AR 0331-34 (prior strategic plans no longer relevant); *see, e.g.*, *United States v. Reid*, 369 F.3d 619, 625 (1st Cir. 2004) (challenge to superseded regulations is moot). And to the extent the Bank's current strategic plan is self-liquidation, that question is subsumed by the Bank's APA claim regarding the denial of its insured status termination application.

Ultimately, again, the real question here is the disposition of the Bank's capital: should that capital be immediately distributed to the shareholders of the Bank, or should any such distribution be postponed until it is determined whether restitution is owed to SBA borrowers injured by the Bank's violations? That is, should the CEO and other insiders who played an outsize role in the Bank's lending violations receive the Bank's remaining reserves and leave the victims of those violations without a remedy, or should the possibility of a remedy be preserved? The FDIC reasonably chose the latter course, and that choice was in no way arbitrary or capricious.

If the Bank wishes to terminate its operations, it can easily do so. It can make the restitution payments sought by the FDIC in full and inform the ALJ that the enforcement matter is moot. The FDIC has told the Bank as much. AR 1935-37. Absent such payment, however, the Bank's request for leave to terminate its insured status was properly denied.

## IV. The Bank's Constitutional Challenge is Meritless.

As a fallback to its APA claims, the Bank pleads in Count II that the FDIC's refusal to consent to the Bank's voluntarily termination of deposit insurance violates constitutional due process. ECF No. 12 ¶¶ 59-74. This is an easy call for this Court, as the FDIC's determination process here comfortably met constitutional requirements. Indeed, the Bank's summary judgment motion does not address or seek judgment on this constitutional claim.

Due process is satisfied by the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976) (internal quotations omitted); *Doolin Sec. Sav. Bank, F.S.B. v. FDIC*, 53 F.3d 1395, 1402 (4th Cir. 1995) (due process does not require formal hearing in FDIC administrative context). Here, the Bank received both adequate notice and a meaningful opportunity to be heard. It submitted applications to the FDIC, and had numerous meetings with agency officials, and presumably

included all of the information and material the Bank desired to be considered in the FDIC's

decision-making process. The FDIC, in turn, presented ample detail explaining its

determinations. There is no basis for a stand-alone constitutional claim here, outside of the APA.

**CONCLUSION**

For the foregoing reasons, the Court should enter summary judgment in favor of the FDIC in this matter.

Respectfully submitted,

FEDERAL DEPOSIT INSURANCE CORPORATION
Andrew Dober
Senior Counsel

/s/ Erik Bond
Erik Bond
Counsel
3501 Fairfax Drive
Arlington, VA 22226-3500
Tel.: (703) 562-6477
Fax: (703) 562-2477
Email: erbond@fdic.gov

DATED:  July 15, 2024